May it please the Court. My name is Richard Marathenas. I have a bit of a cold this morning and I apologize for that. I'm here on behalf of Annette Szaley, the appellant in this matter, Your Honors. This appeal seeks to correct the error that occurred in the district court when it failed to recognize that the words spoken by Annette Szaley to her boss were what they were. A request to be paid a salary free of bias, a bias that continues to adversely affect the wages of women across the country to this very day. Ms. Szaley's request was not made in jest or in a casual setting, but in serious conversation that occurs when a promotion has been awarded. And all that is left is to determine what is the salary, the annual salary to be paid. When asked this question, Ms. Szaley responded she wanted to be paid the same as her male predecessor, Mr. Jim Casanova. She asked for an annual salary of $62,000. She had just completed seven months as the personnel manager for Keno Hospital on a detailed basis. She was there on temporary assignment from her position and had proven herself to the hospital administrator, Dennis Douglas, to be a competent, knowledgeable, and hardworking administrator deserving of her position on a permanent basis. It was Ms. Szaley. I have one question for you about plaintiff's request to be paid the $62,000. In your argument, you said that she wanted to be paid the same as the male. Yes, ma'am. But that, is that the way she phrased it? I thought she merely said, I want to be paid $62,000. Did she mention discrimination, gender, male, female? My impression was that she did not. And if she did, I'd like you to point to the place where that happened. Ms. Szaley made very specific requests to be paid the same as her male predecessor, Your Honor. Right. She made the request to be paid a certain amount. It was clear that she wanted more pay, and it was clear that she wanted the same pay as someone else. But in and of itself, that statement might or might not be enough to alert someone that she's complaining of discrimination. I mean, I'd love to be paid more, too, but it has nothing to do with thinking that I'm being discriminated against. That's my issue. I know that she was very precise about what she wanted to be paid. Your Honor, I just have one moment. I apologize, but I do have it in the record cited, where specifically her immediate predecessor wasn't. Excuse me? Her immediate predecessor was a different person, actually, wasn't it? Right. Her immediate predecessor on detail was a different person. That's a question of, well, that's Mr. Shigalow. Yes. She wanted to be paid the same as Mr. Casanova. No. She asked to be paid on a permanent basis the same as the male predecessor who was Mr. Casanova. Right. But that's my first question. Is that really the correct comparator? Because in the particular job of a detailed job which had some less duties, that was Mr. Shigalow or Shigalow? Shigalow. I believe that's how he pronounces that. Okay. So Mr. Shigalow was in that job immediately prior to her, correct? Yes, ma'am. So maybe you could just start with why you believe Mr. Casanova would be the appropriate comparator rather than Mr. Shigalow. The distinction between the two, Judge McGohan, is that Mr. Shigalow was there on a detailed basis. When Ms. Zaley goes into the position in January of 2003, she goes there on a detailed basis also, and that's at the request of Mr. Douglas. Now, Mr. Douglas, in July of 2003, makes the decision to open the position on a permanent basis, to advertise it. She, Ms. Zaley, applies for that and comes out on the cert list as the applicant to be to fill the position. And he selects her. He tells her and he signs the selection form by August the 5th of 2003 that she is the person selected, and he testifies to that. They meet no later than August the 10th of 2003 as a testimony of Ms. Zaley, and she, in that conversation, asked to be paid the same as Mr. her male predecessor. In that and I will. Okay. So that's really kind of the question now is did she say I want to be paid the same as Mr. Casanova? Yes. Or did she say because he's a male, I don't want to be paid less? What she asked for, Your Honor, is that her quote is to be paid commensurate with the previous male incumbent. She also states, and this is at volume 2, tab 7, paragraph 47, and at tab 9, page 88, lines 23 to page 90, line 17. And then at page 91, lines 19 to 22, Ms. Zaley also testified that she told Mr. Douglas, how about paying me as much as the previous male incumbent? Wait a minute. This case is going off partly procedurally, and I understand it because you don't believe in following the local rules. The statement of facts set forth by the defendant in this statement of facts are taken as true for the purposes of this case. Statement of fact 42 says, for good or ill, on either side, when Scalzi requested the same salary as Casanova had made when he was human resources manager at Keno, the fact was not that Casanova was male, but that he was the previous incumbent. She did not make a claim for the same salary as Casanova based on sex discrimination. That's the fact taken as true by the Court because you decided that's the way you like to do business in Arizona. So that's the fact. Why are we going to debate now whether that fact is true or false? Your Honor, if I may, that oversight on my part was unintentional. You call it an oversight, but you make the oversight regularly, as the Court pointed out, and as you admit, it's an oversight that you like to make. The point is, assuming for the moment, assuming for the moment you're stuck with the bed that you made, there is the statement of fact.  If you accept that statement of fact, Your Honor, it does not undo the ruling in Crawford in where the Supreme Court stated that the words objectively made constitute in and of themselves a statement of objection. And they are a statement of objection that has covered the words that are protected under the objection clause of 42 U.S.C. 2000 E3A. Let me move to another point then. Let's assume that there was protected activity. Let's assume that any objective listener, even given that factual finding, would have understood that an equal pay claim was lurking there. What was the adverse employment action that suffices under Supreme Court precedent to allow a retaliation claim to proceed? And on Burlington Northern, Your Honor ---- I want to know the facts. Yes. I know what the law is, I think. Okay. I'd like you to tell me about the facts. They're numerous, Your Honor. The facts, the adverse actions here include rescission of the promotion, a refusal to acknowledge her rescission of her request for return to her, to a county position from the hospital. Under Rule 11.1, that must have been in writing, she had up to 11 days, excuse me, 10 business days to rescind, which could be accepted. Mr. Douglas admits himself that if by the 22nd, she makes this request on October the 19th, Your Honor, of 2003, she rescinds on October the 22nd. Mr. Douglas himself says that by the 22nd there had not been alternative arrangements made, there was no reason not to accept her rescission, and in fact the record is ---- But they'd already found a replacement. Excuse me? Go ahead. I'm sorry. They'd already found a replacement. No, they had not. And the record is ---- I thought they had. The record is replete with the fact that they had not found a replacement, Judge, and that is made known by a number of facts. One is there's an e-mail on October 23rd saying by Douglas to Mr. Boddsford from UPH saying, you know, hey, here's another prospect, what about your person starting November 1, that's in the record. There's also that the rescission of the promotion is not even signed until October 30th. The contract for Terry LeBaron is not signed until December the 12th, Your Honor. Why would you pay in a financial crisis $23 more an hour than it was going to cost you to have Ms. Zaley in the position? They go from paying $25 an hour to paying $49 an hour for the position, Judge. The adverse actions include, as I said, you know, her promotion being rescinded, the loss of the detail, her salary loss for the loss of the promotion, Judge, is over $8,000 a year. There's a loss of her detail salary, which was approximately $1.20 an hour. And there's a loss of her being permanently promoted to a grade 56 position. She was at a grade 55. These are all discrete, numerous adverse actions that occur to her that are well within the Burlington Northern standard, and certainly within the Ray v. Henderson, which I still believe is good law, even under Burlington Northern. These are all acts that when you take away that which has been earned a promotion, that is an adverse action. And there is also substantial evidence of pretext in this record, as evidenced by the timeline, as evidenced by those facts that also reflect the adverse action, in that there was no reason to rescind this, to not allow her to stay on, there was no reason not to tell her that, in fact, her salary of $60,000 a year, which she accepted, had been approved by the county administrator. She's never told that her salary had been approved, Your Honor. I would like to reserve my remaining two minutes, Your Honor. Certainly. May it please the Court, my name is Leslie Lynch from the Pima County Attorney's Office, and I'm here representing Pima County today. If I might take a minute to respond to the questions that Your Honor has posed to counsel. As far as, for example, the salary, what Ms. Zaley did or did not ask for, as Justice Fernandez said, there is a statement of fact which is admitted for purposes of this case that, in fact, she never did talk or ask for a salary because, in fact, she felt it would be sex discrimination if she did not make the same as Mr. Casanova. In fact, the citation to the record that supports that statement of fact is found on page 52 of our brief, in which we quote exactly what the question was posed to her, where she was asked specifically, did it matter that he was male? You said prior male incumbent. Did it matter that Jim Casanova was male? Her response under oath at that time was the factor was that he was the previous incumbent in the position. So she admitted that, in fact, that was the fact that he was male was not the issue. She wanted to make the same because she felt he was her, he was the incumbent, and she wanted to make the same. Now, in fact, Mr. Shoglev, who was on the detail prior to her, is also actually her comparator in the sense that she was never actually transferred into the position of personnel manager at Keno. If you remember how the case is, Keno, the Pima County had decided that, in fact, as of December of 2001, that Pima County was going to divest itself of the operation and ownership of Keno Hospital. They had not decided at that point exactly who was going, how they were going to do it. But from that point on, they began to negotiate and find a way to divest themselves, so that by September, so in August of 2002, when Mr. Casanova resigns, they're already in discussions with UPI. It's now UPH, but it's, so if I misspeak, I apologize for that, but it's the same entity. They've simply changed their name since this case came up. And anyway, they are in discussions with UPI about taking over the ownership and operation of the hospital. So at the time, so when Mr. Casanova leaves, Pima County decides not to divest. They decided not to fill the position, although they had advertised for a permanent basis. They decided not to fill the position permanently because, in fact, they were unsure what was going to happen with the hospital. That's why they decided to fill it with the detail. And in fact, Mr. Shogolov was the person that was chosen initially for the detail. The detail is a temporary position. It can last for no more than a year. So Ms. Zaley, when she comes out, for example, she comes out at the end of January 2003, she has to go back to her position at the same salary she was making then, unless there's been an increase in the salary in the meantime, by the end of January of 2004. But she's not chosen originally for the detail. At the time, Mr. Shogolov was chosen because the administrator at that time made the determination that Ms. Zaley did not have enough hands-on human resource experience. She does come out in January of 2003. She admits that shortly after that, and it's unclear exactly when, but apparently sometime in February or March, she learns, as do all Keno employees, that permanent employees at Keno, she's not a permanent employee, but permanent employees at Keno will be allowed to transfer elsewhere in the county without a loss in salary if they choose not to apply to go with, at that time, UPI, who was the entity that was going to take over. And in fact, UPI takes over the management of Keno Hospital on February 3 of 2004, only three months after Ms. Zaley leaves the position. Then they manage the hospital until, in fact, the license is transferred and the Medicare license and the state license from the hospital is transferred in June of 2004. So our position has been all along that, in fact, jobs cannot be comparable in any way, shape or form, and they must be substantially equal, because, in fact, the whole position was changed between when Mr. Casanova was there and when Ms. Zaley was there. And in fact, you see... I had a timing question that I may be confused about this. When Ms. Zaley asked to undo her situation and go back to her old position, what was the timing of the arrangement with Terry LeBaron as to whether she, you know, whether Ms. Zaley had or had not been replaced by the time that she asked to go back? When she asked to go back, Mr. Douglas immediately contacts UPI and says, can you bring somebody in to fill the position? Now, there's some evidence in the record that, in fact, they may have been looking for some, there may have been a chance to put somebody other than Ms. LeBaron in that position, but it would have been UPI putting somebody in that position. As it turns out, Ms. LeBaron is a female. She started under a contract effective November 1st. Yes, Your Honor. So what was the timing of Ms. Zaley's request to go back? That's what I was confused about. She makes the request to go back on October 19th. It's a Sunday, I believe. Okay. So essentially before Ms. LeBaron starts. Before Ms. LeBaron starts. There's some evidence in the record that she was going to take some vacation or something during that time, but that's not one of the admitted facts. But that may be why, in fact, the details not technically ended until November 9th. But what happens is, and by the way, I just wanted to be sure that she was the one responsible for filling out that PAF to transfer her into a permanent position. That's never done, and she has no explanation for why it wasn't done. She was asked that question. She does not really have an explanation. But in other words, immediately on that Sunday after she makes the request, Mr. Douglas goes to Mr. Botsford and asks to fill the position with a UPI person, which makes perfect sense, because they're already negotiating to have UPI take over the management of the hospital, which they do on February 3rd. And the evidence also shows that they also brought in a CFO to take over the CFO position, at the same time they brought Ms. LeBaron in to take over the personnel functions at Keno Hospital. So the CFO person, I forget her name, it's Sandy something, begins the same time that Ms. — essentially the same time Ms. LeBaron does. The contract is effective November 1st. Ms. LeBaron comes in November 3. It's not signed until December 12th. That's simply a function of how we have to notice contracts and for board meetings, and they have to be noticed in advance before the board can approve them, that sort of thing. But the contract is effective November 1st. Ms. LeBaron begins November 3. It's immediately after Ms. Zaley makes the request. Also, there is no evidence in the record that Mr. Douglas knew, ever knew, before Ms. Zaley says, I want to come back, that Mr. Huckleberry had approved the request. He was asked that. He could not remember specifically, but he says, I don't have any memory that I knew, I don't remember knowing, having been told by Mr. Huckleberry, at the time Ms. Zaley leaves, says I'm leaving, I want to go back, that in fact Mr. Huckleberry had approved the salary. And the timeline is for the retaliation, for example, where she wants to argue retaliation. Here's the timeline.  Now, Mr. Douglas testifies that, in fact, the reason he went out to advertise for the position was because Ms. Zaley, in June, comes to him and says, I would like to be permanent. Of course, at this time she knows that permanent people are going to be allowed to go back at the salary they're making at Keno. So she asks at that time if she wants to be made permanent. She never really contests this. She says, well, I said that, you know, he came to me and said I was doing a good job. But the uncontested fact is she asked. Mr. Douglas advertises it. She's the only one that applies. She's the only one on the cert list. August 5th, the cert list comes back. August 10th, they have the first conversation about salary. That's when she says, I want the $62,000. That's when apparently he could not agree at that time. I'll see what I can do. And it's not clear in the record exactly when. All we know is it's early in September. He comes back to her and says, okay, I can offer you $60,000. And she accepts it. But because that's above the range that he could approve by himself, he has to get the approval. And she knows he has to get the approval. That's uncontested. They both know Mr. Huckleberry, the county administrator, must approve that increase in salary. Mr. Douglas goes ahead and writes a memorandum. He has to justify this. So he writes a memorandum to justify that salary to Mr. Huckleberry. And then, as I said, the next thing that happens is on October 19th, Ms. Daly says, I want to go back. There's no evidence that Mr. Douglas knew at that point in time or had been told that Mr. Huckleberry had approved it. And, in fact, Mr. Huckleberry doesn't remember approving it at all. That's the now what she says about retaliation is, after I asked for the $62,000, then it starts to get chilly, and I don't think he likes me anymore, and he didn't invite me to a meeting, all of which I would say under this panel's, well, not this panel's, but this Court's most recent case, the Besserell case that was argued in front of this Court in November, I mean, excuse me, in September. It came out in November. This Court said at that time that subjective personalized judgments about what's going on are not sufficient to create an issue of fact for summary judgment purposes. I think this is exactly what's going on here. But she says this starts occurring after she asks for the salary on August 10th. Yet it's undisputed that in September, Mr. Douglas comes back, offers her $60,000. She accepts and then goes ahead and writes the justification for her to get that salary. Well, if he was retaliating against her, why would he go ahead and ask, go out of his way to write a memorandum, to request the county administrator and to justify to the county administrator giving her that salary? So it makes, obviously, there is no evidence of retaliation in this case. The other thing that we wanted to argue in this case on the Title VII issue is that, in fact, the Bennett Amendment defenses do apply in this case. I believe that the admitted facts in the record show that, in fact, they were that under this circuit's authority in Garner, for example, you can consider things like professional experience. In fact, Ms. Daley and Mr. Casanova had wide-ranging differences. Mr. Casanova, for example, had a bachelor's degree in business administration with an emphasis on health services. He had a master's degree in accounting. He had supervised 40 to 60 people in his career at any one time. He had been the vice chancellor of Pima Community College. When he went to the job at Keno, he went from personnel director for the adult probation department with the Pima County Courts. When he was at Keno Hospital, he leaves with the working title of assistant hospital administrator. His job was actually a policymaking function, as he testifies, and there's nothing to refute this. He, in fact, was making policy decisions outside of the range of human resources. He was serving on what they called the core committee, which was the senior managers for the hospital, who made policy decisions for the hospital. He served as administrator of in charge on weekends and holidays. He was the only one that was in charge at the hospital, because it was the ordinary staff was not there. In fact, he testified on one occasion when he was the manager in charge. He had to have, there was a disaster drill that was taking place during that time. He was the only administrator on staff at that point, senior manager. Ms. Zaley has a bachelor's degree, not in health services, no emphasis in health services. Up to the time that she goes to Keno, she has served in administrative capacities, essentially making sure that things get done, that paperwork gets filed, that paperwork gets filed when it's supposed to, that people get drug tests when they're supposed to, things of that nature. While she's at Keno, in fact, it's a holding action. While they're trying to just maintain the hospital so that they can transfer the license. In fact, Mr. Casanova did manage the training and staff development function while he was also, while he was at Keno. It does not, apparently was not part of human resources at that point in time. The difference is it becomes part of human resources when she transfers. But he did, in fact, manage that. What she is doing is she's making sure that the employees get, who want to transfer to the county, who want to stay with the county, fill out job applications, and they get on a list that goes to the Pima County Maine Human Resources Department, which then places these people in other jobs within Pima County. She does not do the placement. Human resources was doing the placement. That's the main function she has while she's there. Counsel, your time has expired. If you have a sentence or two to wrap up, that would be fine. Yes. In other words, I would just say that, in fact, the court was correct in both its ruling on the deeming order and its ruling that there was no evidence to support either the Title VII, the equal pay, or retaliation. Thank you. Thank you, counsel. You have some rebuttal time remaining, Mr. Martinez. Judge McAllen, I believe you had asked the question about who was the appropriate comparator, and I'm not sure that I answered that. I believe under the Hine decision, Judge, that it would be Casanova, because they were both going for the position in a permanent. Permanent. That's why I believe he's the appropriate comparator. Secondly, while counsel has made much, and it's not in dispute as to the different experience and educational backgrounds of the two, Casanova and Ms. Zaley, it's of no consequence, because the factor relied upon here under the Bennett amendments is the factor other than sex, and salary was not based under the Pima County system on either education or experience. What occurs is that Mr. Casanova, when he moved into the position, got an automatic, I believe it was a 2.5 percent, I could be wrong about that, but it was an automatic percentage by merit rule when he moved into the position. When he left the position, he was up to $62,000. When Ms. Zaley applies for the position on a permanent basis, it's in the salary range from the $47,000 to the $70,000 range as reflected in the position announcement. That's what she's negotiating. It's subject to approval by the county administrator because it's going above a certain percentage, and that's why it requires his approval. In closing, judges, Your Honors, Judge Rohl, what he does here, he makes a decision saying that what Ms. Zaley said is insufficient, not protected, not under the opposition clause. He ignores Crawford, and ignores Crawford at the threshold that she did not engage in protected conduct. We believe that that's a patently in error, and that those words that she spoke about, I want to be paid the same as my male predecessor, are protected words in their objective meaning. The subjective questions she's asked at deposition are of no consequence, because it's how they're received by the hearer, not what was intended. And in Crawford, what we have is, you know, an individual who is reporting sexual misconduct, or being asked questions about sexual misconduct that she'd never reported or complained about. Counsel, your time has expired. You may have a sentence or two to wrap up if you'd like. I appreciate that, Judge. In closing, what we would say is that the trial court failed to address adverse action. We believe the prima facie case was made out of retaliation, that there's ample evidence of pretext, and that this is a matter that should have gone to trial, at least as to the issue of retaliation. Thank you. Thank you, counsel. We appreciate the arguments of both parties. And the case is submitted. That will conclude our morning docket. Thank you.
judges: Fernandez, Graber, McKeown